LINDA G. STRICKLAND, Appellant, *v.* EDWARD
WAYMIRE, CHRISTINE MILBURN, ROBERT DRANEY,
AND OTHERS SIMILARLY SITUATED, RESPONDENTS.

No. 55290

TRAVIS CHANDLER, Appellant, *v.* EDWARD WAYMIRE,
CHRISTINE MILBURN, ROBERT DRANEY, AND OTHERS
SIMILARLY SITUATED, RESPONDENTS.

No. 55551

July 1, 2010 235 P.3d 605

*Linda G. Strickland*, Boulder City, in Proper Person.

*Travis Chandler*, Boulder City, in Proper Person.

*Mueller Hinds & Associates* and *Chad N. Dennie*, Las Vegas,
for Respondents.

# OPINION

By the Court, PICKERING, J.:

These consolidated appeals require us to interpret Article 2, Section 9 of the Nevada Constitution, which subjects every public officer in Nevada to recall by special election upon the filing of a qualifying recall petition signed by ''not less than twenty-five percent (25%) of the number'' of registered voters ''who actually voted in the state or in the county, district, or municipality [that the officer] represents, at the election in which [the officer] was elected.'' Nev. Const. art. 2, § 9.

The question presented is whose signature counts toward the 25 percent needed to qualify a recall petition. Is it any registered voter, as the district court held? Or must the signatures come from those registered voters who in fact—''actually''—voted at the election in which the public officer was elected, as the Secretary of State and the Attorney General have concluded? Reasonable policy arguments exist on both sides. But Article 2, Section 9's text and relevant history convince us that the latter reading is more faithful to the provision's test and the evident understanding of the citizens who enacted it. We therefore reverse.

## I.

Appellants Linda Strickland and Travis Chandler were elected to the Boulder City Council in 2007: Strickland as a result of achieving an absolute majority in the April 2007 primary; Chandler, in the June 2007 general election that followed. In 2008, separate recall petitions were circulated against each of them. Enough people signed to qualify the petitions, if the signers only needed to be registered voters. However, not everyone who signed the petitions actually voted in the 2007 primary and general elections that seated Strickland and Chandler, respectively. Counting only the signatures of people who voted in the relevant election, neither petition met the 25 percent needed to qualify.

Respondents are Boulder City citizens who submitted the petitions to recall Strickland and Chandler to the Secretary of State in June 2008. In March and May 2008, before the petitions were submitted, the Secretary of State and Attorney General issued separate letter rulings, in which they interpreted Article 2, Section 9 to require that a qualifying recall petition be signed by voters who actually voted in the officer's election, comprising 25 percent of the total voter turnout for that election. Consistent with these rulings, the Secretary of State rejected the petitions to recall Strickland and Chandler. Dissatisfied, respondents sued pursuant to NRS 293.12795(3).

Not much happened in the suit (beyond Strickland and Chandler intervening to support the defendant Secretary of State) until September 2009, when respondents moved for summary judgment. They based their motion mainly on Senate Bill (S.B.) 156, which the 2009 Nevada Legislature passed in response to the interpretations given Article 2, Section 9 of the Nevada Constitution by the Secretary of State and Attorney General and the failed recall petitions against Strickland and Chandler. S.B. 156 amends NRS 306.020(2), effective October 1, 2009, to provide that a "petition to recall a public officer may be signed by any registered voter of the [locale] that the public officer represents, regardless of whether the registered voter cast a ballot in the election at which the public officer was elected." 2009 Nev. Stat., ch. 61, § 1, at 168.

By order dated January 7, 2010, the district court granted summary judgment, validating the recall petitions against Strickland and Chandler. This appeal timely followed. We ordered a stay pending briefing, argument, and decision and now reverse.

## II.

### A.

We begin with the text of Article 2, Section 9 of the Nevada Constitution, in particular, its first two and final sentences, which state:

> Every public officer in the State of Nevada is subject, as herein provided, to recall from office by the registered voters of the state, or of the county, district, or municipality which he represents. For this purpose, not less than twenty-five percent (25%) of the number who actually voted in the state or in the county, district, or municipality which he represents, at the election in which he was elected, shall file their petition, in the manner herein provided, demanding his recall by the people. . . . Such additional legislation as may aid the operation of this section shall be provided by law.

The remaining text of Article 2, Section 9 is set out below.[1] In summary, it directs that the recall petition explain, in fewer than

---

[1] The balance of Article 2, Section 9 reads:

They shall set forth in said petition, in not exceeding two hundred (200) words, the reasons why said recall is demanded. If he shall offer his resignation, it shall be accepted and take effect on the day it is offered, and the vacancy thereby caused shall be filled in the manner provided by law. If he shall not resign within five (5) days after the petition is filed, a special election shall be ordered to be held within thirty (30) days after the issuance of the call therefor, in the state, or county, district, or munici-

200 words, why recall is demanded; that, if the petition qualifies, a special election must be called; and that other candidates may be nominated for the special election, with the candidate who receives the most votes to finish the term.

In interpreting Article 2, Section 9, we, like the United States Supreme Court, "are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (alteration in original) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). "[W]hen a constitutional provision's language is clear on its face, we will not go beyond that language in determining the voters' intent." *Secretary of State v. Burk*, 124 Nev. 579, 590, 188 P.3d 1112, 1120 (2008). Conversely, "[i]f a constitutional provision's language is ambiguous, meaning that it is susceptible to 'two or more reasonable but inconsistent interpretations,' we may look to the provision's history, public policy, and reason to determine what the voters intended." *Id.* (footnote omitted) (quoting *Gallagher v. City of Las Vegas*, 114 Nev. 595, 599, 959 P.2d 519, 521 (1998)).

The goal of constitutional interpretation is "to determine the public understanding of a legal text" leading up to and "in the period after its enactment or ratification." 6 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 23.32 (4th ed. 2008 & Supp. 2010). Not all legislative history is created equal. While "[c]ontemporary construction of the Constitution is very relevant," *id.*, and "legislation enacted immediately following the

---

pality electing said officer, to determine whether the people will recall said officer. On the ballot at said election shall be printed verbatim as set forth in the recall petition, the reasons for demanding the recall of said officer, and in not more than two hundred (200) words, the officer's justification of his course in office. He shall continue to perform the duties of his office until the result of said election shall be finally declared. Other candidates for the office may be nominated to be voted for at said special election. The candidate who shall receive highest number of votes at said special election shall be deemed elected for the remainder of the term, whether it be the person against whom the recall petition was filed, or another. The recall petition shall be filed with the officer with whom the petition for nomination to such office shall be filed, and the same officer shall order the special election when it is required. No such petition shall be circulated or filed against any officer until he has actually held his office six (6) months, save and except that it may be filed against a senator or assemblyman in the legislature at any time after ten (10) days from the beginning of the first session after his election. After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which he was elected, unless such further petitioners shall pay into the public treasury from which the expenses of said special election have been paid, the whole amount paid out of said public treasury as expenses for the preceding special election.

. . . adoption of an amendment [is given great weight] in determining the scope of a constitutional provision," *id.* § 23.34, later statutes "inconsistent with the Constitution [cannot] furnish a construction that the Constitution does not warrant." *Id.* § 23.33.

## B.

We confront two very different interpretations of Article 2, Section 9 in this case. Both concentrate on the phrase "not less than twenty-five percent (25%) of the number who actually voted" but each picks different words to emphasize. The first interpretation favors Strickland and Chandler and has the support of the Secretary of State and Attorney General. This interpretation takes the phrase "who actually voted" as determinative and holds that only those who voted in the election that seated the public officer can qualify a petition to recall that officer. The second interpretation, for which respondents contend, won in the district court and carried in the 2009 Legislature. This interpretation sees the word "number" as purely quantitative and takes it as settling matters in favor of allowing the signature of any registered voter to qualify a recall petition.

It is a mistake to divorce the debate over the meaning of words from their context. A recall election allows registered voters to remove elected officers from public office ahead of the next regularly scheduled election. Once a recall election is called, all registered voters can vote in it. Thus, the first sentence of Article 2, Section 9 declares: "Every public officer . . . is subject, as herein provided, to recall from office by the registered voters."

However, there is a seemingly deliberate change in terminology between the first and second sentences in Article 2, Section 9. The second sentence concerns who can petition for a recall election and states: "For this purpose, not less than . . . 25% of the number who actually voted . . . at the election in which [the public officer] was elected, shall file their petition . . . demanding his recall by the people." As the Attorney General cogently reasons, "[t]he change in terminology from 'registered voters' in the first sentence to '25% of the number who actually voted' in the second sentence indicates a limitation on who can sign the petition demanding a recall election, *i.e.*, registered voters who actually cast ballots in the specific election." This limitation makes sense. A recall election involves a "do-over" of an already-concluded election ahead of the next-scheduled election. As a parliamentary matter, it is not unreasonable to limit the beginning, petition-stage part of the recall process to those who turned out to vote the first time around. Then, if the petition qualifies and a special election gets

set, all registered voters participate in deciding whether to retain or replace the targeted official.

The parties direct us to dictionary definitions of the words "number" and "actually." "Number" means "quantity" and "total" but it also means "collection or company." *Webster's New Universal Unabridged Dictionary* 1330 (2d ed. 1996). If taken to mean "quantity" or "total," the use of the word "number" in Article 2, Section 9 favors respondents. Read to mean "collection or company," however, "number" suggests a group of individuals with individual characteristics and is consistent with the meaning advanced by Strickland and Chandler. The use of the personal relative pronoun "who" to introduce the clause immediately following "number" suggests the latter. *See* George O. Curme, *A Grammar of the English Language: Syntax* 224 (1931) ("It is the tendency to express the idea of personality by the use of *who* and the idea of lack of life or personality by the use of *which.*"); *id.* at 210 ("The usual relatives were *that* and *which*; but after *who* had acquired definite force it rapidly came into favor, for it had a great advantage over its competition—it referred only to persons— hence for reference to persons it was a clearer form.").

"Actually" means "as an actual or existing fact; really." *Webster's, supra,* at 21. Thus, literally adhering to the provision's words, the signer must have "as an actual or existing fact; really" voted at the election in which the position was filled. As an adverb, "actually" may not add very much to the verb "voted." Still, as the debate in this case illustrates, the word "actually" does vivify the personal "who" by which the phrase "actually voted" is introduced, personalizing "number" as something more than just abstract quantity; it also adds emphasis to "voted." This "may not be very heavy work for the [word 'actually'] to perform, but a job is a job, and enough to bar the rule against redundancy from disqualifying an otherwise sensible reading." *Gutierrez v. Ada,* 528 U.S. 250, 258 (2000). And, as respondents conceded at oral argument, their reading of Article 2, Section 9 leaves "actually" with no job at all, which our rules do not allow. *Youngs v. Hall,* 9 Nev. 212, 222 (1874) ("In expounding a constitutional provision such construction should be employed as will prevent any clause, sentence or word from being superfluous, void or insignificant.").

Text alone, in sum, favors Strickland and Chandler.

## C.

Granting for argument's sake that Article 2, Section 9 is reasonably susceptible to two interpretations and so ambiguous— though that seems generous—we look beyond text to relevant history.

Article 2, Section 9 was added to the Nevada Constitution in 1912. *See* 1911 Nev. Stat., file no. 4, at 448. It has since been amended twice: first in 1970; and again in 1996. *See* 1969 Nev. Stat., file no. 43, at 1663; 1995 Nev. Stat., file no. 25, at 2888.

Originally, Article 2, Section 9 did not mention "number" or "actually." The first sentence read much like it does today, except "qualified electors" stood in for "registered voters." However, the second sentence was different and said:

> For this purpose [recall] not less than twenty-five per cent (25%) of the qualified electors who vote in the state or in the county, district, or municipality electing said officer, at the preceding election, for justice of the supreme court, shall file their petition, in the manner herein provided, demanding his recall by the people.

1911 Nev. Stat., file no. 4, at 448.

Minus "actually" and with the baseline a potentially unrelated general election "for justice of the supreme court," the case for using the number purely quantitatively—as the end result of multiplying the defined base number by .25, nothing more—seems reasonable. But this was not the contemporaneous interpretation. From day one, both the Legislature and the judiciary viewed even the original version of Article 2, Section 9 as imposing both qualitative and quantitative restrictions on who could qualify a recall petition—limiting the petition prerogative to electors who had turned out and voted in the earlier relevant election.

*State v. Scott*, 52 Nev. 216, 285 P. 511 (1930), analyzes the original version of Article 2, Section 9 and its companion legislation in detail. "Pursuant to [the newly ratified Article 2, Section 9], the [1913] legislature passed an act [1913 Nev. Stat., ch. 258, §§ 1-11, at 400-01] consisting of eleven sections providing for the recall of public officers." *Scott*, 52 Nev. at 225, 285 P. at 513. Section 2 of the 1913 act, which *Scott* reprints in full, said unmistakably that qualifying a recall petition took signatures from those who had voted in the relevant baseline election:

> For the purpose of recalling any public officer there shall be first filed . . . a petition, signed by the qualified electors who voted in the state, or in the county, district or municipality electing such officer, equal in number to twenty-five per cent of the votes cast in said state, or in the county, district or municipality for the office of justice of the supreme court, at the last preceding election.

*Id. Scott* goes on to state that these provisions in the contemporaneously enacted statute, "[e]xcept in some minor details, . . . are the same as the provisions of said section 9, article 2, of the

[C]onstitution." *Id.* at 226, 285 P. at 513. *Accord Batchelor v. District Court*, 81 Nev. 629, 631-32, 408 P.2d 239, 240 (1965) ("we read the constitutional language to require the recall petition to be signed by not less than 25 percent of the qualified electors of [(coincidentally)] Boulder City who voted at the last general election for a Supreme Court justice"; again stating that the updated version of the companion statute considered in *Scott*, while it "strays somewhat from the constitutional language . . . does not carry a different meaning nor impose a different requirement" than Article 2, Section 9).

In 1970, the voters ratified the first amendment to Article 2, Section 9. 1969 Nev. Stat., file no. 43, at 1663. "Qualified electors" was replaced with "registered voters," and "actually" and "number" made their debut. *Id.* The reference to the election "for justice of supreme court" was eliminated and replaced by "general" election. *Id.* As revised, the second sentence of Article 2, Section 9 read:

> For this purpose [recall], a number of registered voters not less than twenty-five per cent (25%) of the number who actually voted in the state or in the county, district, or municipality electing said officer, at the preceding general election, shall file their petition, in the manner herein provided, demanding his recall by the people.

*Id.*

If by the introduction of the word "number" the 1970 voters intended to eliminate the rule that only those who exercised their right to vote in the relevant baseline election can qualify a recall petition, you would expect a direct statement and express language to that effect, given *Scott* and the law it discussed as settled. *See* 3 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 58:3, at 114-15 (7th ed. 2008) (" 'where a[ later] act purports to overturn long-standing legal precedent and completely change the construction placed on a statute by the courts,[2] it is not too much to require that it be done in unmistakable language' " (quoting *State ex rel. Housing Auth. of Plant City v. Kirk*, 231 So. 2d 522 (Fla. 1970))). No such statement was made. Instead, along with the word "number" came the word "actually" and the phrase "who actually voted"—signifying that the requirement that a qualifying recall petition be signed by voters who voted in the relevant election would remain and certainly not suggesting it would be scrapped.

---

[2]Rules of statutory construction apply to constitutional interpretation. *Burk*, 124 Nev. at 590 n.32, 188 P.3d at 1120 n.32.

The question put to the voters who ratified Article 2, Section 9's amendment in 1970 confirms our reading. It asked point-blank: "Shall [Article 2, Section 9] relating to the recall of public officers" be amended to "provid[e] that the number of petitioners required to recall public officers be not less than 25 percent of the registered voters who actually voted at the last general election?" Constitutional Amendments and Other Propositions to be Voted Upon in State of Nevada at General Election, November 3, 1970, Question No. 2 (available at Nevada Legislative Counsel Bureau Research Library).[3] Thus phrased, the ballot question passed on a popular vote of 62,460 to 50,545. *Id.*

And if, despite all this, any niggling doubt remained as to what "number who actually voted" signified, it was laid to rest in *Foley v. Kennedy*, 110 Nev. 1295, 885 P.2d 583 (1994):

> According to the referenced constitutional provision, twenty-five percent of the persons who actually voted in the relevant political division in the preceding general election shall file their petition for recall. Thus, twenty-five percent of the persons who voted in the general election preceding the filing of the petition must sign the recall petition.

*Id.* at 1299, 885 P.2d at 585 (dictum).

The 1996 amendments changed the relevant baseline election from the "preceding general election" to "the election in which [the officer] was elected," 1995 Nev. Stat., file no. 25, at 2888, but not the requirement that a qualifying recall petition be signed by people who voted in the relevant election, comprising 25 percent of the turnout for that election.

---

[3]The 1970 amendment changed the baseline election, not the requirement that the signer have voted in the baseline election, however defined. We note that the explanation accompanying the ballot question specified that a "yes" vote would:

> chang[e] the number and qualifications of petitioners required to recall public officers from not less than 25 percent of the qualified electors who vote in the preceding election in the state, county, district or municipality electing the officer in question to not less than 25 percent of the registered voters who actually voted at the last general election.

The reference to the preceding local election is puzzling given that the existing version of Article 2, Section 9, as interpreted in both *Scott* and *Batchelor*, calculated the signers as 25 percent of those who had voted in the most recent local election at which a supreme court justice was on the ballot. The reference appears to be to the challenge the court rejected in *Batchelor*, where it was argued the percentage needed to come from those who had voted in the officer's election. *See Batchelor*, 81 Nev. at 631-32, 408 P.2d at 240. While the history of Article 2, Section 9 shows shifts as to which past election should be the baseline for the 25-percent calculation, the commitment to limiting the petition prerogative to those who actually voted in the relevant baseline election has been unwavering.

The history of Article 2, Section 9 (before the 2009 Legislature's passage of S.B. 156, more on which below) thus leads to the same conclusion as our exegesis of its text: While all registered voters can vote at a special recall election, only voters who voted at the relevant baseline election can qualify a recall petition, and it takes 25 percent of them for a special election to be called.

## D.

This brings us to policy. As respondents note, it is the general "rule that an act for recall should be liberally construed with a view to promote the purpose for which it was enacted." *Scott*, 52 Nev. at 231, 285 P. at 515; *Cleland v. District Court*, 92 Nev. 454, 455-56, 552 P.2d 488, 489 (1976). But what does this mean here? Unlike impeachment, which requires "misdemeanor or malfeasance in office," Nev. Const. art. 7, § 2, recall requires only a statement in the petition of "the reasons why . . . recall is demanded," Nev. Const. art. 2, § 9—the legitimacy of which the voters alone decide.

"Recall is aimed at removing officials who have acted 'corruptly' in the sense that they are no longer representing the people but are serving the interests of a powerful minority," Elizabeth Garrett, *Democracy in the Wake of the California Recall*, 153 U. Pa. L. Rev. 239, 272 (2004), or who have "gone back on key promises [such that] the people should be able to make use of the recall process to undo a selection process in which they were effectively sold a false bill of public goods." Vikram David Amar, *Adventures in Direct Democracy: The Top Ten Constitutional Lessons from the California Recall Experience*, 92 Cal. L. Rev. 927, 946 (2004) (footnote omitted). Nevada adopted its recall provision in 1912, just a year after California did. Cal. Const. art. XXIII, § 1 (1911). In Nevada, as in California, "there is no evidence to suggest that framers, adopters, and early users of the recall measure saw it as a mechanism to rerun an ordinary election in which there had been no dishonesty and after which there had been no evidence of special interest group capture." Amar, *supra*, at 946; 27 *The American Nation: A History* 164 (Albert Bushnell Hart ed., Harper 1918). And, as we have noted, the "[s]tate has a [particular] interest in 'safeguarding' the recall procedure" given that "a recall petition attacks a public official whom the public has already once elected and, if successful, requires a costly special election at the taxpayers' expense." *Citizens for Honest Gov't v. Sec. of State*, 116 Nev. 939, 949, 11 P.3d 121, 127 (2000).

Requiring 25 percent of the voters who turned out at the election that put the targeted official in office to qualify a recall petition makes recall more difficult than respondents' interpretation would. However, that does not make the provision suspect or illegitimate. Respondents' interpretation would make a low-turnout election readily subject to a do-over at the behest of those who simply stayed home and didn't bother to vote—especially where, as can occur, an unopposed officer is elected by virtue of a single vote in a primary—with the perverse result that the least controversial elections would be easiest to undo. Allowing citizens who did not vote to call for a do-over arguably disenfranchises those voters who participated in selecting the official. This carries its own risks of "undermin[ing] an element of representative democracy, namely, regularly scheduled elections which allow for political accountability at regular periods." Garrett, *supra*, at 273.

Different states have drawn the recall battle lines differently, depending on how their citizens assess the strength of the competing policies in play. *See* Jay M. Zitter, Annotation, *Sufficiency of Technical and Procedural Aspects of Recall Petitions*, 116 A.L.R.5th 1 (2004). Where Nevadans have drawn the line makes practical sense and deserves respect.

### E.

Last, there is S.B. 156. With an effective date of October 1, 2009, this legislation postdates the petitions to recall Strickland and Chandler and so doesn't directly apply to them. *See Burk*, 124 Nev. at 592, 188 P.3d at 1121 (statutes normally do not apply retroactively to acts completed before their effective date). Nonetheless, respondents urge that we must read Article 2, Section 9 their way to avoid putting the Constitution at odds with the newly enacted provisions of NRS 306.020(2). This argument has matters backward. "The constitution may not be construed according to a statute enacted pursuant thereto; rather, statutes must be construed consistent with the constitution," *Foley*, 110 Nev. at 1300, 885 P.2d at 586—and rejected if inconsistent therewith. *See* 6 Rotunda & Nowak, *Treatise on Constitutional Law*, *supra*, § 23.33. Accepting respondents' position "would require the untenable ruling that constitutional provisions are to be interpreted so as to be in harmony with the statutes enacted pursuant thereto; or that the constitution is presumed to be legal and will be upheld unless in conflict with the provisions of a statute." *Foley*, 110 Nev. at 1300-01, 885 P.2d at 586.

Nor does S.B. 156 gain sway in this case by reason of the final sentence of Article 2, Section 9, which states: "Such additional

legislation as may aid the operation of this section shall be provided by law." This sentence licenses legislation that " 'aid[s] the operation' of the recall right" provided in Article 2, Section 9, *Citizens for Honest Gov't*, 116 Nev. at 947, 11 P.3d at 126 (quoting Nev. Const. art. 2, § 9), not law that changes the constitution's substantive terms without submitting the constitutional change to popular vote. *See We the People Nevada v. Secretary of State*, 124 Nev. 874, 886-87, 192 P.3d 1166, 1174-75 (2008).

## III.

Respondents assert that our reading of Article 2, Section 9 abridges the voters' "fundamental right to have access to the ballot." This conflates the right to submit a petition calling for recall with the right to vote at the special election that follows, which are two different things. A special election called as a result of a qualifying recall petition is open to all registered voters on equal terms. As to the initiating petition itself, the state has an " 'important' [interest in] promot[ing] the efficient regulation of recall petitions so that 'some sort of order, rather than chaos' accompanies the process" and so that "a costly special election at the taxpayers' expense" ahead of the next-scheduled election is not called except as provided in the state constitution. *Citizens for Honest Gov't*, 116 Nev. at 947, 949, 11 P.3d at 126, 127 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Differentiating between who can initiate a recall petition and who can vote at the special election that follows the filing of a qualified recall petition does not offend the Fourteenth Amendment. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order . . . is to accompany the democratic processes").

For these reasons we REVERSE.

PARRAGUIRRE, C.J., and HARDESTY, DOUGLAS, CHERRY, SAITTA, and GIBBONS, JJ., concur.