MICHAEL KEVIN POHLABEL, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 55403

January 26, 2012                         268 P.3d 1264

[Rehearing denied March 20, 2012]

*Frederick B. Lee, Jr.*, Public Defender, and *Alina M. Kilpatrick*, Deputy Public Defender, Elko County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Mark Torvinen*, District Attorney, and *Robert J. Lowe*, Deputy District Attorney, Elko County, for Respondent.

# OPINION

By the Court, PICKERING, J.:

Michael Pohlabel pleaded guilty to being a felon in possession of a firearm in violation of NRS 202.360. In doing so, he reserved the right to argue on appeal, as he did unsuccessfully in the district court, that his conviction violates the right to keep and bear arms secured by the Second Amendment to the United States Constitution and by Article 1, Section 11(1) of the Nevada Constitution. Because we reject Pohlabel's argument that, despite his felon status, he has a constitutional right to possess a black powder rifle, we affirm.

## I.

The conviction underlying this appeal grew out of a traffic stop in rural Nevada. During the stop, the police spotted a rifle in

the back of the car. Pohlabel told police the rifle was his and that he was taking it with him on a fishing trip. The rifle was an in-line black powder rifle. Seven years earlier, Pohlabel had been convicted of two felony counts of possession of a controlled substance.

NRS 202.360(1)(a) makes it a felony for a convicted felon to "own or have in his or her possession . . . any firearm."[1] Charged with violating this statute, Pohlabel moved to dismiss. In support of his position, Pohlabel presented expert testimony concerning black powder rifles (they must be loaded by hand each time a shot is fired, take at least 45 seconds to load, and are hard to conceal) and argued that, given their limitations, black powder rifles pose little threat and should not, and constitutionally cannot, be forbidden to nonviolent felons like himself. While federal law prohibits felons from possessing firearms, it excludes antique and muzzle-loading replica firearms, including black powder rifles like Pohlabel's, from its ban. *See* 18 U.S.C. § 921(a)(3), (a)(16)(C) (2006). To Pohlabel, the fact that federal law permits what Nevada law forbids when it comes to felons possessing black powder rifles demonstrates the lack of basis for, and unconstitutionality of, Nevada law.

The district court denied Pohlabel's motion to dismiss. Thereafter, Pohlabel pleaded guilty but reserved the right to challenge the constitutionality of his conviction on appeal. Pohlabel has remained out of custody pending appeal.

## II.

### A.

Pohlabel summarizes his argument as follows:

> Because the constitutions of the State of Nevada and the United States make the right to bear arms fundamental, any restriction of the right is subject to strict scrutiny, placing the burden on the State to show that any restriction of the right is "narrowly tailored" to serve a "compelling state interest." Keeping felons from possessing black powder rifles does not survive strict scrutiny because they take too much time to load, can only hold one bullet at a time, and are not easily concealable on the person.

(Footnotes omitted.) In Pohlabel's view, "[i]t would be easier to rob a liquor store or mug a tourist with a bow and arrow than a black powder rifle."

---

[1] *Gallegos v. State*, 123 Nev. 289, 163 P.3d 456 (2007), invalidated paragraph b of NRS 202.360(1) as unconstitutionally vague because it did not define "fugitive from justice." This holding does not affect the paragraph at issue here, NRS 202.360(1)(a). In refusing to incorporate federal definitions into NRS 202.360, however, *Gallegos* implicitly rejects Pohlabel's argument that we should read into NRS 202.360(1)(a) the federal definition of "firearm."

Pohlabel's argument, however well-articulated, makes a fatal mistake: It assumes that the constitutional right to keep and bear arms applies to felons on equal terms with other citizens. This assumption is insupportable. The Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), lays to rest the argument that the Second Amendment only protects gun rights associated with militia service. But the core individual right *Heller* recognizes—the "right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635—categorically, or at least "presumptively," *id.* at 627 n.26, does not extend to felons, *id.* at 626-27. And judged by its text and the evident understanding of the voters who adopted it in 1982, Article 1, Section 11(1) of the Nevada Constitution similarly disqualifies felons from the right to keep and bear arms. Applying the de novo review appropriate to constitutional challenges, *Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007), we therefore reject Pohlabel's strict scrutiny approach and uphold the constitutionality of NRS 202.360(1)(a).

### B.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Heller* holds, based on "both text and history, that the Second Amendment confer[s] an individual right to keep and bear arms," unconnected from militia service, for the "core lawful purpose of self-defense" in the home. 554 U.S. at 595, 630. Two years after *Heller*, *McDonald v. Chicago*, 561 U.S. 742 (2010) (plurality opinion), declared that "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," *id.* at 778, and that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*," making it applicable to the states. *Id.* at 791.

*Heller* characterizes the Second Amendment as guaranteeing "the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). It contrasts this category of citizens, whose gun rights the Second Amendment protects (the "law-abiding" and "responsible"), with "felons and the mentally ill," whom the government may prohibit from possessing firearms:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon

> whatsoever in any manner whatsoever and for whatever purpose. . . . [N]*othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill.

*Id.* at 626 (emphasis added). In a footnote, the Court explains that its list of "presumptively lawful regulatory measures" is illustrative and not exhaustive. *Id.* at 627 n.26. *McDonald* reiterates that "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose'" and that neither *Heller* nor *McDonald* "cast[s] doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

*Heller*'s declaration that the government can prohibit felons, categorically, from possessing firearms cannot be dismissed as dicta. The opinion conditioned Heller's right to keep a loaded handgun in his home on him not being "*disqualified* from the exercise of Second Amendment rights," 554 U.S. at 635 (emphasis added)—that is, he qualified for the relief the Court granted him only "if he is not a felon and is not insane." *Id.* at 631. *Heller*'s statement about felon-disqualification thus is not dicta; it limits the very relief Heller won. *See United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011) ("the Supreme Court's discussion in *Heller* of the categorical exceptions to the Second Amendment was not abstract and hypothetical; it was outcome-determinative"); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("[t]o the extent that . . . *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta"); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (under *Heller*, "felons are categorically different from the individuals who have a fundamental right to bear arms"; this holding is not dicta because if Heller proved to be a felon or insane, he was "disqualified" from Second Amendment protection); *see also United States v. Marzzarella*, 614 F.3d 85, 90 n.5 (3d Cir. 2010) (collecting cases and noting that "'there is dicta and then there is dicta, and then there is Supreme Court dicta'" (quoting *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006)).

We recognize, as the Third Circuit did in *Marzzarella*, that *Heller*'s footnoted reference to felon-dispossession laws, among others, being "presumptively lawful" could mean one of two different things. "On the one hand, this language could be read to suggest the identified restrictions"—here, a prohibition against felons possessing any type of firearm—"'are presumptively lawful because they regulate conduct outside the scope of the Second Amendment." *Marzzarella*, 614 F.3d at 91. On the other hand, it

may mean that such restrictions "are presumptively lawful because they pass muster under any standard of scrutiny." *Id.* Although both readings are reasonable, "the better reading, based on the text and the structure of *Heller*, is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms." *Id.* We agree. *Heller* does not treat felons (and the mentally ill) as having qualified Second Amendment rights but, rather, as "exceptions" to its coverage. 554 U.S. at 635. This comports with the *Heller* majority's categorical approach—and consequent, emphatic rejection of the judicial balancing advocated by the dissent. *Id.*; *see* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 375, 405 (2009) ("[f]rom its central holding, which extends broad protection to the 'individual' right to bear arms unconnected from militia service, to its flat exclusions of felons, the mentally ill, and certain 'Arms' from constitutional coverage, the majority opinion in *Heller* was categorical in its approach"; "[t]he least discussed element of *District of Columbia v. Heller* might ultimately be the most important: the battle between the majority and dissent over the use of categoricalism and balancing in the construction of constitutional doctrine").

*Marzzarella* suggests "a two-pronged approach to Second Amendment challenges." 614 F.3d at 89. First, the reviewing court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If it does not, the inquiry ends. If the challenged law does burden protected conduct, the court must "evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

In this case, the Second Amendment inquiry ends with the first question. Pohlabel is a felon who violated NRS 202.360(1)(a), which prohibits a felon from possessing "any firearm," "loaded or unloaded and operable or inoperable," NRS 202.360(3)(b), including a black powder rifle. *See Harris v. State*, 137 P.3d 124, 128-29 (Wyo. 2006) (Wyoming's felon-dispossession statute, which, like Nevada's, prohibits felons from possessing "any firearm," Wyo. Stat. Ann. § 6-8-102, encompasses black powder rifles, which meet standard dictionary definitions of "firearm" because they are "capable of firing a projectile by using an explosive as a propellant" (internal quotation omitted)); NRS 202.253(2) ("'[f]irearm' means any device designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion"). Although critics of *Heller* have questioned its historical analysis of felon-

dispossession laws (and whether it makes sense to apply them to regulatory felonies unknown at common law), *see* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 697, 699-713 (2009), *Heller* confirms that Nevada can, consistent with the Second Amendment, prohibit convicted felons from possessing firearms. Means-end scrutiny, whether strict or intermediate, does not apply.[2]

In so holding, we recognize but do not credit Pohlabel's argument that three features of his case overcome NRS 202.360(1)(a)'s presumptive lawfulness: (1) his predicate convictions did not involve violence,[3] (2) his record was clean for the seven years that elapsed between his felony convictions and his arrest for violating Nevada's felon-in-possession law, and (3) black powder rifles are clumsy and ill-suited to criminal endeavor. The problem with each of these proffered distinctions is that none brings Pohlabel, a convicted felon, within the ambit of the Second Amendment.

Pohlabel's first and second points demonstrate, not so much the lack of justification for applying Nevada's felon-in-possession law to him, as his arguable eligibility for executive clemency or pardon. But the statute under which Pohlabel was convicted recognizes that a rehabilitated felon can have his right to keep and bear arms restored. *See* NRS 202.360(1)(a) (it is a felony to possess "any firearms if the person . . . has been convicted of a felony . . . , *unless the person has received a pardon and the pardon does not restrict his or her right to bear arms*" (emphasis added)). The statutory scheme commits the determination, though, to the pardons board; the lost right must be restored before it can be exercised. NRS 202.360(1)(a) "suggests that [the Legislature] clearly intended that [a] defendant clear his status" by having his rights restored "*before* obtaining a firearm, thereby fulfilling [the Legislature's evident] purpose 'broadly to keep firearms away from the persons [the Legislature] classified as potentially irresponsible and dangerous.'" *Lewis v. United States*, 445 U.S. 55, 64-65 (1980) (quoting *Barrett v. United States*, 423 U.S. 212, 218 (1976)). The legislative judgment "that a convicted felon . . . is

---

[2]The fact that Pohlabel's case falls squarely within *Heller*'s list of "presumptively lawful" exceptions to the Second Amendment distinguishes cases like *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), which applied intermediate scrutiny to a Second Amendment challenge by a misdemeanant convicted of domestic violence, whom 18 U.S.C. § 922(g)(9) (2006) prohibits from carrying firearms in or affecting interstate commerce.

[3]Because we sustained Pohlabel's objection to the State's motion to supplement the record with Pohlabel's presentence investigation report, we express no opinion on, but accept for discussion purposes only, the accuracy of Pohlabel's characterization of his criminal history as nonviolent. *See also United States v. Torres-Rosario*, 658 F.3d 110, 113 (3d Cir. 2011) (rejecting argument that possession with intent to distribute controlled substances did not involve the threat of violence).

among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness is rational." *Id.* at 67 (upholding conviction under federal felon-dispossession law even though the predicate felony was the result of an uncounseled guilty plea and thus subject to collateral attack). Under *Heller*, given Pohlabel's felon status, more is not required. *See United States v. Torres-Rosario*, 658 F.3d at 113 & n.1 (noting that "[a]ll of the circuits to face the issue post-*Heller* have rejected blanket challenges to felon in possession laws" (collecting cases)).[4]

As for the distinction between a black powder rifle and other types of firearm, Pohlabel's argument is illogical, since *Heller* focuses on the right of self-defense and, by Pohlabel's own admission, black powder rifles take too long to load and are too hard to conceal to be helpful in armed confrontations. More fundamentally, unless Pohlabel can bring himself within the protections of the Second Amendment despite his felon status—he has not—the heightened scrutiny that would invite judicial reassessment of ostensibly legitimate, legislative line-drawing does not obtain. *Cf. Rozier*, 598 F.3d at 771 (rejecting the argument by a felon in possession of a firearm that, notwithstanding *Heller*'s categorical exclusion of felons from the Second Amendment, he could not constitutionally be denied the core right to possess a handgun in his home for self-defense; under *Heller*, "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment").

While federal law currently permits felons to possess black powder rifles, that does not mandate that Nevada follow suit. *See Harris*, 137 P.3d at 129 (rejecting argument that the Wyoming Supreme Court should adopt the federal definition of firearm in 18 U.S.C. § 921(a), when its legislature did not). The choice as to whether to deny felons the right to possess any and all firearms, as Nevada has done, or to permit them to possess antique firearms and black powder rifles, as Congress has done, is legislative, not judicial. Without a constitutional imperative demanding more ex-

---

[4]Citing *Britt v. State*, 681 S.E.2d 320 (N.C. 2009), *Torres-Rosario* recognizes that the Supreme Court may yet be open to claims that "some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban" or even "highly fact-specific objections," such as the 30 years that had elapsed, crime-free, between Britt's single predicate conviction and firearm charge. 658 F.3d at 113. However, it noted that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Id.* In our judgment, the pardon and collateral review avenues, which *Lewis*, 445 U.S. at 67, and NRS 202.360(1)(a) require a convicted felon to pursue to successful conclusion *before* acquiring a firearm, adequately address the problem *Britt* treats, without introducing the uncertainty and administrative difficulties *Torres-Rosario* predicts.

acting review, such distinctions do not invalidate state laws that differ from their federal counterpart. *See* 18 U.S.C. § 927 (2006) ("No provisions of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field . . . to the exclusion of the law of any State on the same subject matter"); *United States v. Haddad*, 558 F.2d 968, 973 (9th Cir. 1977) (federal gun laws are not "an encroachment on, but rather a complement to, state regulation").

## C.

We turn next to Article 1, Section 11(1) of the Nevada Constitution, which provides: "Every citizen has the right to keep and bear arms for security and defense, for lawful hunting and recreational use and for other lawful purposes." Pohlabel argues that, despite his felon status, he is a Nevada "citizen" and thus has the right "to keep and bear arms for security and defense [and] for lawful hunting and recreational use." The State counters that the Nevada Constitution only guarantees "lawful" possession of firearms and that, under NRS 202.360(1)(a), Pohlabel's possession of the black powder rifle was unlawful and thus unprotected. While we conclude that Article 1, Section 11(1), like the Second Amendment, categorically disqualifies felons from the gun rights it secures, we do not accept either side's reading of its text.

"In interpreting [Article 1, Section 11(1)] we, like the United States Supreme Court, 'are guided by the principle that [t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Strickland v. Waymire*, 126 Nev. 230, 234, 235 P.3d 605, 608 (2010) (second alteration in original) (quoting *Heller*, 554 U.S. at 576). "The goal of constitutional interpretation is 'to determine the public understanding of a legal text' leading up to and 'in the period after its enactment or ratification.'" *Id.* at 234, 235 P.3d at 608-09 (quoting 6 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 23.32 (4th ed. 2008 & Supp. 2010)). When the language of a constitutional provision is unambiguous, its text controls. *Secretary of State v. Burk*, 124 Nev. 579, 590, 188 P.3d 1112, 1120 (2008). Conversely, "[i]f a constitutional provision's language is ambiguous, meaning that it is susceptible to 'two or more reasonable but inconsistent interpretations,' we may look to the provision's history, public policy, and reason to determine what the voters intended." *Id.* (quoting *Gallagher v. City of Las Vegas*, 114 Nev. 595, 599, 959 P.2d 519, 521 (1998)).

We begin with the State's argument that "the rights involved in Article 1, § 11 are limited to *lawful possession*" and that because

"[t]he legislature has made it illegal for felons . . . to possess firearms," the constitutional guarantee does not apply. The State's reading gives the Legislature the exclusive authority to determine when it is "lawful" to possess a firearm and when it is not. But this is not what the Constitution says. "Lawful" does not modify "possession" in Article 1, Section 11(1); it modifies "purposes," which itself is limited by appearing at the end of a list: "Every citizen has the right to keep and bear arms *for* security and defense, *for* lawful hunting and recreational use and *for other lawful purposes*." (Emphasis added.) The phrase "other lawful purposes" gives the Legislature the authority to expand the lawful purposes for which a citizen may keep and bear arms, but it does not authorize the Legislature to diminish them. Any other reading would reduce the constitutional guarantee to nothing more than what the Legislature permits, making it meaningless. This "simply cannot be correct," *United States v. Lopez*, 514 U.S. 549, 589 (1995) (Thomas, J., concurring).

Article 1, Section 11(1)'s history supports our rejection of the State's lax reading of it. Unlike many other states, whose constitutions have secured gun rights from statehood days, Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 193-204 (2006) (cataloguing state constitutional provisions), the Nevada Constitution did not guarantee the right to keep and bear arms until 1982, when voters overwhelmingly (162,460 to 66,385) approved Article 1, Section 11(1), as proposed by the 1979 and 1981 Nevada Legislatures. *See* Questions to Be Voted Upon in State of Nevada at General Election, November 2, 1982, Question No. 2 (available at Nevada Legislative Counsel Bureau Research Library) (hereafter, "1982 Questions to Be Voted Upon"). The 1982 ballot materials told voters that the amendment, as proposed, meant that "[t]he legislature could not restrict the enumerated purposes, but could make others lawful." *Id. See also* Hearing on A.J.R. 6 Before the Assembly Judiciary Comm., 60th Leg. (Nev., January 23, 1979) (the amendment was proposed "so that a future Legislature could not come in and easily change the law to allow some type of control [over firearms]"); *id.* (its purpose was to safeguard individual rights and make it difficult "for a future Legislature . . . to change the law").

Although we reject the State's position, we are also not persuaded by Pohlabel's argument that Article 1, Section 11(1)'s reference to "every citizen" includes him, an unpardoned felon. The word "every" is self-explanatory. However, the word "citizen" is subject to two reasonable, but inconsistent, interpretations. Because of this ambiguity, it is unclear whether the voters

understood "citizens" to include "felons" when they adopted Article 1, Section 11(1) in 1982.[5]

One way to read the word "citizen" is as a "generic substitute for 'accused,' 'person,' 'defendant,' or 'individual.' " M. Isabel Medina, *Ruminations on the Fourth Amendment: Case Law, Commentary, and the Word "Citizen,"* 11 Harv. Latino L. Rev. 189, 192 (2008). For example, the Nevada Constitution often uses the words "citizen" and "people" interchangeably. *Compare* Article 1, Section 9 ("Every citizen may freely speak, write and publish . . . .") *with* Article 1, Section 10 ("The people shall have the right freely to assemble . . . ."). Similarly, the word "citizen" may be used in reference to a civilian, a person who is not a specialized servant of the state. *Webster's II New College Dictionary* 209 (3d ed. 2005). *See, e.g., Carrigan v. Commission on Ethics*, 126 Nev. 277, 236 P.3d 616 (2010) (contrasting elected board members with citizens), *rev'd*, 564 U.S. 117 (2011); *Las Vegas Police Prot. Ass'n v. Dist. Ct.*, 122 Nev. 230, 130 P.3d 182 (2006) (discussing a citizen's complaint against the police board).

A second meaning of "citizen" is "[a] person who . . . is a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections; a member of a civil state, entitled to all its privileges." *Black's Law Dictionary* 278 (9th ed. 2009). Under this definition, "citizenship is a status, which entails individuals to a specific set of universal rights granted by the state." Jason Schall, *The Consistency of Felon Disenfranchisement With Citizenship Theory*, 22 Harv. BlackLetter L.J. 53, 69 (2006) (quotation omitted). Often, these rights align with the "most basic of American political behaviors—voting and participation in the political process." Medina, *supra*, at 202.

Because of this ambiguity, it is appropriate to look at the context and history of Article 1, Section 11(1) in determining whether "every citizen" includes felons.

Upon conviction, a felon loses many precious civil rights. Thus, in Nevada, a felon may not vote (*see* NRS 176A.850; Nev. Const. art. 2, § 1), serve on a jury (NRS 6.010), hold a public office (*see, e.g.*, NRS 253.010), be employed in sensitive positions, such as peace officer or licensed school teacher (NRS 289.555; NRS 391.033), or, as this case illustrates, possess firearms (NRS

---

[5]Nevada is one of the 16 states that constitutionally limits the right to bear arms to "citizens." The remaining 26 state constitutional provisions specify state citizens or use the words "people," "person," "individual," or "men." *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 193-204 (2006).

202.360(1)(a)).[6] Historically, Nevada's pardon statutes have referred to these lost rights as rights of "citizenship" that it takes a pardon (or reversal of conviction) to restore. *See* 2 Nev. Compiled Laws § 3797 (1873) ("When a pardon is granted for any offense committed, such pardon may or may not include restoration to citizenship. If the pardon include restoration to citizenship, it shall be so stated in the instrument or certificate of pardon; and when granted upon conditions, limitations, or restrictions, the same shall be fully set forth . . . ."); 1931 NCL § 11573 (also referring to "restoration of citizenship"); 1973 Nev. Stat., ch. 804, § 4, at 1845 (same). Although the current version of this statute refers to the restoration of a convicted person's "civil rights," including, specifically, the right to bear arms, *see* NRS 213.090, the reference to "restoration to citizenship" survives in its companion, NRS 213.030(1), and existed in NRS 213.090 up until 1977, the session preceding that in which what became Article 1, Section 11(1) was first proposed. 1977 Nev. Stat., ch. 367, § 1, at 665. This equation—of lost rights of "citizenship" with the rights an unpardoned felon loses by reason of his conviction—existed in Nevada law for the century preceding the addition of Article 1, Section 11(1) to the Nevada Constitution. Since gun rights are among the rights of "citizenship" or the "civil rights" that a felon has historically been seen as losing by reason of conviction in Nevada, it is reasonable to read the reference to "every citizen" in Article 1, Section 11(1) to exclude unpardoned felons.[7]

This interpretation of Article 1, Section 11(1) comports with the voter's evident understanding of it. Thus, the voters who approved its adoption were assured in the ballot materials that "[s]imilar language in other state constitutions has not been interpreted by the courts to prevent prohibiting . . . (2) the possession of weapons by convicted felons." 1982 Questions to Be Voted Upon, Explanation. *See also Strickland*, 126 Nev. at 239 & n.3, 235 P.3d at 611 & n.3

---

[6]Nevada's felon-dispossession statute dates back at least to 1925. *See* 1925 Nev. Stat., ch. 47, § 2, at 54 (prohibiting felons from possessing a "pistol, revolver, or other firearm capable of being concealed on the person"). We acknowledge that this provision formerly only applied to concealable "firearms having a barrel less than twelve inches in length," *id.*, and that NRS 202.360(1)(a) did not prohibit felons from possessing *any* firearms until 1985. *See* 1985 Nev. Stat., ch. 160, § 3, at 594. The Legislature's broadening of the felon-dispossession statute over time does not alter our conclusion that, as felons are not "citizens" within the meaning of Article 1, Section 11(1), the state may prohibit them from possessing firearms, regardless of type. *See Rozier*, 598 F.3d at 770, and text accompanying note 4, *supra*.

[7]Article 1, Section 11(1)'s use of the phrase "every citizen" where the Second Amendment uses the more inclusive phrase, "the people," simplifies our interpretive task. For a general discussion see Pratheepan Gulasekaram, *"The people" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521 (2010).

(consulting ballot materials to disambiguate a Nevada constitutional amendment passed by popular vote).

Finally, the legislative history also supports our conclusion. Thus, some members of the 1979 and 1981 Legislatures expressed concern that the proposal that became Article 1, Section 11 could invalidate Nevada's felon-dispossession law. Hearing on A.J.R. 6 Before the Assembly Judiciary Comm., 60th Leg. (Nev., February 26, 1979); Hearing on A.J.R. 6 Before the Senate Judiciary Comm., 60th Leg. (Nev., April 26, 1979); Hearing on A.J.R. 6 Before the Senate Judiciary Comm., 61st Leg. (Nev., February 25, 1981); *but see* Senate Journal, 61st Leg., at 273 (March 6, 1981) (Senator Neal expressed the view that a felon is not a citizen and would not be allowed to carry a weapon unless he "has gained his citizenship back.").[8] To assuage these concerns, the Senate Judiciary Committee asked the legislative counsel bureau for a legal interpretation of the amendment. The legislative counsel offered the opinion that similar provisions in other states did not prohibit reasonable regulations, including those that prohibit felons from keeping or bearing arms. Hearing on A.J.R. 6 Before the Senate Judiciary Comm., 61st Leg. (March 3, 1981).

Together, these publicly available materials convince us that the Legislature and the voters used the word "citizen" in Article 1, Section 11(1) to refer to those persons who are members of our political community and that unpardoned felons are not included among those to whom the Nevada Constitution guarantees the right to keep and bear arms.

For these reasons, we affirm.

SAITTA, C.J., and DOUGLAS, CHERRY, GIBBONS, HARDESTY, and PARRAGUIRRE, JJ., concur.

---

[8]Pohlabel argues that the Legislature intended to follow federal law and did not specifically omit felons from the amendment because federal law already prohibited felons from possessing guns. Although we agree that some legislators discussed federal law, we do not find this discussion particularly helpful. Furthermore, at the time voters approved the Nevada constitutional provision for the right to bear arms, it was still illegal for a felon to possess a black powder rifle under federal law. 18 U.S.C. § 922(h)(1) (1976).