137 Nev., Advance Opinion 3

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JANE DOE DANCER I; JANE DOE DANCER II; JANE DOE DANCER III; AND JANE DOE DANCER V, INDIVIDUALLY, AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED INDIVIDUALS, Appellants, vs. LA FUENTE, INC., AN ACTIVE CORPORATION, Respondent. | No. 78078 |

**FILED**

FEB 25 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a district court order granting summary judgment in a minimum wage class action. Eighth Judicial District Court, Clark County; Kerry Louise Earley, Judge.

*Reversed and remanded.*

Bighorn Law and Kimball J. Jones, Las Vegas; Rusing Lopez & Lizardi, PLLC, and Michael J. Rusing, Tucson, Arizona, for Appellants.

Hartwell Thalacker, Ltd., and Doreen Spears Hartwell, Las Vegas; Schulten Ward Turner & Weiss, LLP, and Dean R. Fuchs, Atlanta, Georgia, for Respondent.

BEFORE THE COURT EN BANC.

21-05565

## OPINION

By the Court, PICKERING, J.:

This case is a sequel to *Terry v. Sapphire Gentlemen's Club*, which adopted the federal economic realities test to guide courts in determining whether an employment relationship exists in the context of Nevada's statutory minimum wage laws, NRS Chapter 608. 130 Nev. 879, 888, 336 P.3d 951, 958 (2014). Applying that test to the provisions of NRS Chapter 608 as they then existed, this court held that performers at the Sapphire men's club were employees, not independent contractors, and accordingly entitled to statutory minimum wages under that chapter. The Legislature subsequently enacted NRS 608.0155, which established "for the purposes of [NRS Chapter 608]" a conclusive presumption of independent contractor status for certain workers meeting specified criteria, regardless of whether those workers might otherwise qualify as employees under *Terry* and the economic realities test, thus expanding the ranks of independent contractors and excluding previously qualifying workers from statutory minimum wage protections.

In this appeal, appellants (Doe Dancers) similarly argue they are in fact employees, not independent contractors, but this time within the context of Article 15, Section 16 of the Nevada Constitution, the Minimum Wage Amendment (MWA), rather than NRS Chapter 608. The extent of the MWA's reach is a question *Terry* left open, *see* 130 Nev. at 883, 336 P.3d at 955, and to which NRS 608.0155's application is less obvious. Accordingly, to resolve Doe Dancers' appeal, we must again interpret the term "employee," this time pursuant to the MWA, apply that interpretation to the circumstances at issue here, and then determine whether NRS 608.0155's statutory expansion of the definition of independent contractor—

SUPREME COURT
OF
NEVADA

(O) 1947A




which is the opposite side of employee on the relational coin, *see, e.g.*, Debra T. Landis, Annotation, *Determination of "Independent Contractor" and "Employee" Status for Purposes of § 3(3)(1) of the Fair Labor Standards Act (29 USCS § 203(e)(1))*, 51 A.L.R. Fed. 702 (1981) (collecting cases)—excludes workers who would otherwise be MWA employees from its protections. We hold that the same economic realities test we applied in the context of statutory minimum wage claims in *Terry* applies to the constitutional MWA claims at issue here; that the Doe Dancers are employees, not independent contractors, under that test; and that NRS 608.0155 does not abrogate the constitutional protections to which they are therefore entitled. Thus, the district court erred by granting summary judgment in favor of the respondent and against the Doe Dancers, and we reverse and remand.

I.

Each of the Doe Dancers has, at some point, performed at Cheetahs Lounge, a men's club owned by respondent La Fuente, Inc. (Cheetahs). Each Doe Dancer performed at the venue for a different period of time and with differing experience. But, according to testimony by Cheetahs' operations manager, Diana Ponterelli, Cheetahs permitted the Doe Dancers to dance there based on certain shared qualifications—specifically, they showed up with a valid sheriff's card, state ID, work license, and costume, were not "trashed," and were "standing up." Cheetahs did not require that any Doe Dancer have prior dance training. Cheetahs did not check any Doe Dancer's references or employment history. Cheetahs did not ask that any Doe Dancer audition—not even "just to turn in circles"—before Cheetahs gave her[1] a shift.

_____

[1]It appears that the Doe Dancers all identify as female; thus, we use feminine pronouns.

The moment Doe Dancers' respective shifts began, however, Cheetahs' tone changed. The club imposed controls on Doe Dancers beginning at the door—requiring that they pay a "house fee" at entry as well as an "off stage fee," or else check-in with the D.J. for on-stage rotation. Myriad written and posted limitations on the Doe Dancers' costumes and performances met them inside the club—setting a minimum heel height of two-inches, grip strips, mandatory; prohibiting "clog type" shoes, "street clothes," "cotton material," "tears in your stockings or outfits," glitter and body oil; requiring graceful stage exits; and defining appropriate body placement during performances and while interacting with customers. And, the posted rules carried on, addressing dancer manners ("Keep feet off the furniture") and etiquette ("Working together is very important." "PLEASE GIVE [other dancers] THE SAME RESPECT THAT YOU WOULD LIKE THEM TO GIVE YOU."); social interactions ("[D]o not walk up to a customer and just ask him for a dance, talk to them, get to know him a little . . . leave a great and lasting impression. Sit at least one song with them first."); personal hygiene ("A MUST"); wound care ("ALL CUTS TO BE COVERED WITH . . . BAND-AIDS."); transportation ("CABS AND YOUR RIDE WILL PICK YOU UP AT THE DRESSING ROOM DOOR ONLY." "Anyone giving you a ride . . . is not allowed in the club during your shift."); and parking ("ALL NIGHT TIME ENTERTAINERS—AFTER 7PM WILL VALET PARK OR HAND KEYS OVER TO HOUSE MOM."). The posted rules further spiral into the sort of minutia likely familiar to many who have worked in a workplace ("All items [in the refrigerator] out by the end of [the] shift." "You are responsible for all your own things." "No food or drink is to be kept in your locker . . . BUGS!!!"); constraints perhaps somewhat less familiar, but that still may be common in certain service

SUPREME COURT
OF
NEVADA

(O) 1947A

4

sectors ("NO SMOKING OR GUM CHEWING ON THE FLOOR." "No CELL phones on the floor." "No purses allowed on the floor." "Put all your belongings in [your] locker, not under the counter."); and ultimately singular and seemingly intrusive limitations ("LET MANAGER KNOW OF [YOUR PRESCRIPTION] MEDICATIONS." "NO GLASS in the dressing room. NO PLASTIC CUPS on the dressing room floor." "DO NOT LEAVE YOUR SHIFT WITHOU[T] CHECKING OUT WITH THE MANAGER AND THE DJ." "No boyfriends, husbands, or lovers allowed in the club while you are [w]orking." "Ask if you can put something in [the refrigerator]." "YOU WILL BE CHECKED ON ALL SHIFTS FOR BEING INTOXICATED BY HOUSEMOM." "You MUST NOT refuse a drink or shooter from a customer." "You MUST change costumes at least three times during a shift.").

The record does not allow for misunderstanding---Ponterelli's testimony and the management log book clearly demonstrate that these rules were enforced as posted. Indeed, even above and beyond those posted rules, Cheetahs seems to have set less tangible standards for the Doe Dancers, with the log book indicating that multiple performers were prohibited from dancing at the club or otherwise disciplined for having a "bad attitude," "offend[ing] . . . male customers," being "total ghetto," acting like a "prima donna," being "very disrespectable to [management]," or having a "poor, rude, nasty attitude toward [staff]." And Ponterelli similarly testified that a central characteristic shared by prospective performers who Cheetahs ultimately did not allow to dance was a perceived "attitude" problem.

Before dancing at Cheetahs, each Doe Dancer was required to sign a "Dancer Performer's Lease" agreement with Cheetahs. Under these

SUPREME COURT
OF
NEVADA

(0) 1947A

agreements (1) Cheetahs purports to "lease[ ] to Performer and Performer leases from [Cheetahs] the non-exclusive right during normal business hours to use the stage area and certain other portions of [Cheetahs' premises] . . . for the performing of live nude and/or semi-nude entertainment"; and (2) any employment relationship is "**SPECIFICALLY DISAVOW[ED].**" Nothing in these agreements diminishes the control that Cheetahs reserved the right to exert through its posted rules and commentary. To the contrary, the form of lease agreements the dancers signed specified that Cheetahs "shall have the right to impose . . . rules and regulations upon the use of [Cheetahs] by [a performer] . . . in its *sole and absolute discretion*." (Emphasis added.)

Despite their having contractually "disavow[ed]" any employment relationship with Cheetahs in the Lease agreement, the Doe Dancers claimed they were, in fact, employees within the legal meaning of the term. They accordingly demanded minimum wages from the club. which Cheetahs refused to pay because it considered them independent contractors. As a result, the Doe Dancers brought the underlying class action, in which the Doe Dancers and Cheetahs filed cross motions for summary judgment. The Doe Dancers sought a ruling that they were employees rather than independent contractors, as a matter of law, and entitled to minimum wages under both NRS Chapter 608 and the MWA; Cheetahs sought a ruling that the Doe Dancers were conclusively presumed to be independent contractors pursuant to NRS 608.0155's expanded definition of the phrase, and therefore not employees or eligible for the minimum wages demanded. The district court concluded that NRS 608.0155 applied to the Doe Dancers, rendering them independent contractors ineligible for minimum wages under both NRS Chapter 608 and

the MWA, and granted the club's motion for summary judgment while denying the Doe Dancers' cross motion. This appeal followed.

## II.

As noted, in *Terry*, we determined that certain performers—laboring under circumstances largely similar to those of the Doe Dancers—were "employees" within the meaning of NRS Chapter 608 (governing "Compensation, Wages and Hours"), not independent contractors as Sapphire had classified them, such that they were entitled to the state statutory minimum wage. *See* 130 Nev. at 892, 336 P.3d at 960. And in the district court, the Doe Dancers demanded both statutory minimum wages in accordance with *Terry* and constitutional minimum wages pursuant to the MWA, the proper application of which *Terry* left unanswered. *See* 130 Nev. at 883, 336 P.3d at 955. On appeal, however, the Doe Dancers have abandoned their statute-based claims, instead relying solely on the constitutional protections the MWA extends to "employees." This raises, as a question of first impression, the extent of the MWA's reach. And because the district court denied the Doe Dancers' motion for summary judgment and granted Cheetahs' on the ground that NRS 608.0155, which the Legislature enacted in 2015, applied to negate both categories of the Doe Dancers' claims, the resolution of this appeal likewise involves questions of the constitutional supremacy of the MWA, which was first approved by voters in the 2004 general election. We examine all of these questions de novo. *W. Cab Co. v. Eighth Judicial Dist. Court*, 133 Nev. 65, 73, 390 P.3d 662, 670 (2017) (reviewing questions of constitutional interpretation de novo); *Torres v. Goodyear Tire & Rubber Co.*, 130 Nev. 22, 25, 317 P.3d 828, 830 (2014) (reviewing questions of statutory construction de novo); *Wood v.*

SUPREME COURT
OF
NEVADA

(O) 1947A

7

*Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (reviewing grant of summary judgment de novo).

## A.

If the Doe Dancers do not qualify for MWA protections, the constitutional assessment of NRS 608.0155 in Part III, *infra*, would not need to follow. The threshold question, then, is the proper interpretation of the MWA. The MWA speaks in sweeping terms. It mandates that "[e]ach employer shall pay a wage to each employee." And it defines "employee" broadly, with only the narrowest of exceptions: "'Employee' means *any person who is employed by an employer* . . . but does not include an employee who is under eighteen (18) years of age, employed by a nonprofit organization for after school or summer employment or as a trainee for a period not longer than ninety (90) days." Nev. Const. art. 15, § 16(C) (emphasis added). Though it borders on rote to do so at this point, we note that the definition's text is not alone sufficient to guide our interpretation. *Cf. Leven v. Frey*, 123 Nev. 399, 403, 168 P.3d 712, 715 (2007) (noting that where a law's language is "plain and its meaning clear, the courts will apply that plain language"). Nor does the surrounding language place it in meaningful explanatory context. Nev. Const. art. 15, § 16(C) (defining an employer as any "entity that may employ individuals or enter into contracts of employment"). Indeed, we previously assessed subsection C as "tautological," *Terry*, 130 Nev. at 884, 336 P.3d at 955, which assessment still holds. Accordingly, we must look to external aids of interpretation. *See Orion Portfolio Servs. 2, LLC v. County of Clark*, 126 Nev. 397, 402, 245 P.3d 527, 531 (2010).

This exercise highlights the extent to which *Terry's* echoes resound here—the definition of employee in *Terry* was similarly ambiguous,

SUPREME COURT
OF
NEVADA

(0) 1947A

*see* NRS 608.010 (defining employees as "persons in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed), and its relevant context was likewise unhelpful. *See Terry*, 130 Nev. at 883-84, 336 P.3d at 955 (discussing the MWA and finding it not helpful to the statute's textual interpretation). Accordingly, in *Terry*, despite expressly noting the divergence between the language of NRS 608.010 and 29 U.S.C. § 203(e)(1) of the Fair Labor Standards Act (FLSA), we looked to federal case law interpreting the FLSA to understand the former, recognizing that "the Legislature has long relied on the federal minimum wage law to lay a foundation of worker protections that this State could build upon." 130 Nev. at 884, 336 P.3d at 955. But in the context of the MWA, federal FLSA law carries even greater persuasive weight, given that the relevant language of the MWA (defining employee as "any person who is employed by an employer," Nev. Const. art. 15, § 16(C)) so closely mirrors the FLSA 29 U.S.C. § 203(e)(1) (defining employee as "any individual employed by an employer"). *Amazon.com, Inc. v. Integrity Staffing Sols., Inc.*, 905 F.3d 387, 398 (6th Cir. 2018) (stating that as a general proposition, "when interpreting state provisions that have analogous federal counterparts, Nevada courts look to federal law unless the state statutory language is 'materially different' from or inconsistent with federal law" (internal quotations omitted)); *see also Middleton v. State*, 114 Nev. 1089, 1107 n.4, 968 P.2d 296, 309 n.4 (1998) (using federal law to interpret state statute because the two were "largely equivalent").

The FLSA's definition of employment predates the MWA by decades, and courts' applications of the "economic realities test" to that language have been "nearly ubiquitous" during that period. *Campusano v.*

SUPREME COURT
OF
NEVADA

(O) 1947A

9

*Lusitano Constr. LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012); *see also* Fair Labor Standards Act of 1938, Pub. L. No. 718, § 3, 52 Stat. 1060, 1060 (1938) (enacting the federal definition); *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (applying the economic realities test). In light of this, the definition of employee found in the FLSA and mirrored by the MWA "has acquired . . . a technical legal sense" that informs its meaning. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 324 (2012); *cf. Nev. Att'y for Injured Workers v. Nev. Self-Insurers Ass'n*, 126 Nev. 74, 84, 225 P.3d 1265, 1271 (2010) (presuming "that the Legislature enacted the statute with full knowledge of existing statutes relating to the same subject" (internal quotations omitted)). This canon of construction promotes legal stability; put differently, the members of the bar practicing in this field of law should be able to "assume that the [same] term bears the same meaning," absent some clear indicia to the contrary. Scalia & Garner, *supra*, at 324. And, nothing here signals against application of the well-established proposition that "if a word [or phrase] is obviously transplanted from another legal source, . . . it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947); *cf.* Ballots; Labor Comm'r; Wages, 05-04 Op. Nev. Att'y Gen. 18, 18 (2005) (stating that in this context "the voters should be presumed to know the state of the law in existence related to the subject upon which they vote" (citing Bounties for Destruction of Predatory Animals, 34-153 Op. Nev. Att'y Gen. (1934))).

This tracks with what we have previously stated regarding the breadth of the MWA's terms, which establish a protective wage floor for workers in this state. *See, e.g., Terry*, 130 Nev. at 884, 336 P.3d at 955 (noting that the MWA "signal[s] this state's voters' wish that more, not

SUPREME COURT
OF
NEVADA

(O) 1947A

fewer, persons would receive minimum wage protections"); *Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. 484, 488, 327 P.3d 518, 521 (2014) (noting the MWA's "broad definition of employee and very specific exemptions"). Relatedly, as a practical matter, the MWA can only offer protections equal to or broader than the FLSA's. *See Jane Roe Dancer I-VII v. Golden Coin, Ltd.*, 124 Nev. 28, 33, 176 P.3d 271, 274 (2008) (citing FLSA savings clause as evidence of congressional intent "to leave room for state law to establish *higher* minimum wages than those set by the FLSA" (emphasis added)); *see also* 123 Am. Jur. Trials 1, § 7 (2012) (noting that "[t]he FLSA sets the *lowest* bar for compliance and permits states and other jurisdictions to enact laws that are more rigorous"). And, as we have previously noted, "a broader or more comprehensive coverage of employees" than that provided under the economic realities test "would be difficult to frame." *Terry*, 130 Nev. at 886, 336 P.3d at 956 (quoting *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945)). Nor would an *ad hoc* judicial conjuring of some test with an identical reach be advisable, particularly given the desirability of stability discussed above and Cheetahs' failure to cogently argue for any such alternative. *Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 & n.38, 130 P.3d 1280, 1288 & n.38 (2006).

In sum, we hold that the federal economic realities test applies to define the scope of the MWA's constitutional definition of employee.

B.

Because the economic realities test is based on a totality of circumstances, courts have used a range of factors in their analyses of the same. *See Terry*, 130 Nev. at 888-89, 336 P.3d at 958. There are six that "courts nearly universally consider":

1) the degree of the alleged employer's right to control the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

4) whether the service rendered requires a special skill;

5) the degree of permanence of the working relationship; and

6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 888-89, 336 P.3d at 958. Applying these factors to find an employment relationship in *Terry*, we noted that our holding was, at that time, consistent with "the great weight of authority" using the economic realities test, which had "almost 'without exception . . . found an employment relationship and required . . . nightclub[s] to pay [their] dancers a minimum wage.'" *Id.* at 892, 336 P.3d at 960 (quoting *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1343 (N.D. Ga. 2011) (collecting cases)). And it remains true that "courts continue to trend . . . to allowing exotic dancers coverage under [the] FLSA" and the corresponding economic realities test as employees, rather than excluding them from minimum wage protections as independent contractors. J. Dalton Person, *Exotic Dancers & FLSA: Are Strippers Employees?*, 69 Ark. L. Rev. 173, 179 (2016) (collecting cases).[2]

---

[2]*See also Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 232 (3d Cir. 2019) (dancers were employees under the economic realities test); *McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 273-75 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (accord); *Gilbo v. Agment LLC*, No. 1:19-cv-00767, 2020 WL 759548, at *7 (N.D. Ohio Feb. 14, 2020) (accord); *Hurst v.*

That said, exotic dancers are not, as a class, categorically employees entitled to constitutional minimum wages under the MWA, as opposed to independent contractors. Instead, that question must be decided case by case, with reference to the particular circumstances of the relationship involved.

Here, the material facts surrounding the Doe Dancers' work for Cheetahs are undisputed. The question of their employment status is therefore one of law, *Terry*, 130 Nev. at 889, 336 P.3d at 958; *see also Purdham v. Fairfax Cty. Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011) (noting that the question of whether a worker is an employee under FLSA is one of law); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1441 (10th Cir. 1998) (accord); *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 n.4 (5th Cir. 1981) (accord), to which de novo review applies. *Terry*, 130 Nev. at 889, 336 P.3d at 958.

With regard to the first factor of the economic realities test, that is, Cheetahs' "right to control the manner in which" the Doe Dancers performed, the record does not evince any meaningful difference between the circumstances here and those in *Terry* that would weigh against a finding of employment. Both here and in *Terry*, the clubs set various rules governing dancers' appearances, performances, and on-shift conduct. *See*

---

*Youngelson*, 354 F. Supp. 3d 1362, 1378 (N.D. Ga. 2019) (accord); *Shaw v. Set Enters., Inc.*, 241 F. Supp. 3d 1318, 1323-27 (S.D. Fla. 2017) (accord); *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, at *11 (D. Colo. July 27, 2015) (accord); *cf. Embry v. 4745 Second Ave., Ltd.*, No. 419-cv-00305-JAJ-RAW, 2019 WL 8376264, at *2 (S.D. Iowa Nov. 13, 2019) (denying club's motion to dismiss because "the facts pleaded, accepted as true, are such that a finder of fact could reasonably infer that the plaintiff and the other dancers were employees, rather than independent contractors).

*Terry*, 130 Nev. at 890, 336 P.3d at 959 (discussing control element of economic realities test). If anything, Cheetahs reserved (and seemingly exercised) a more extensive right to control its dancers than the club in *Terry*. For instance, as detailed at the outset, Cheetahs' posted rules apparently required that dancers demonstrate a "respectable" attitude, not just toward customers, but toward staff and fellow performers; make a set number of costume changes; wear a specific number of G-strings; eschew costumes made of certain materials; not approach customers at certain locations in the club; cover cuts with Band-Aids; remove personal items from the refrigerator at the end of each shift; keep their belongings in lockers (secured with a "Cheetah[s'] lock" to be purchased from Cheetahs); and keep cups off the dressing room floor. Indeed, the record supports that Cheetahs' expansive control began at a dancer's entry—where the club apparently required that she relinquish her car keys—and continued until her exit—where, after checking out with the DJ and floor manager, she seems to have needed to take and pass a breathalyzer test in order to have those keys returned.

As to the second factor of the economic realities test, it appears that the Doe Dancers' respective opportunities for profit or loss were not meaningfully tethered to their managerial skills. This is because, markedly similar to the club in *Terry*, Cheetahs has established "'a framework of false autonomy' that gives performers 'a coercive "choice" between accruing debt to the club or redrawing personal boundaries of consent and bodily integrity.'" 130 Nev. at 889, 336 P.3d at 959 (quoting Sheerine Alemzadeh, *Baring Inequality: Revisiting the Legalization Debate Through the Lens of Strippers' Rights*, 19 Mich. J. Gender & L. 339, 347 (2013)). Like the club in *Terry*, Cheetahs set the prices for both the house fee and dances; required

the Doe Dancers to be in rotation for stage dances for a certain number of songs, unless they paid an off-stage fee; demanded a cut from any earned "funny money"; and aggressively "encourage[d]" the Doe Dancers to tip out other employees. And, if a Cheetahs' dancer wished to leave before her six-hour shift expired—if, for example, it was an exceptionally slow night at the club—her house fee was higher. Accordingly, here, as in *Terry*, any boundaries the Doe Dancers set with a customer or the club—by, for instance, refusing to accept "funny money" or requesting permission to leave early—risked them ultimately "taking a net loss." *Terry*, 130 Nev. at 890, 336 P.3d at 959.

With regard to the third factor, the Doe Dancers' respective investments in "equipment or materials" were, as the performers' in *Terry*, seemingly limited to their appearances and costuming. Cheetahs, not the Doe Dancers, invested in the club's marketing. Cheetahs, not the Doe Dancers, financed club operations and repairs. Cheetahs, not the Doe Dancers, managed payroll. Cheetahs, not the Doe Dancers, obtained (and ran) the club's only credit card machine. Cheetahs, not the Doe Dancers, paid rent. Cheetahs, not the Doe Dancers, invested in the club's "ambiance, layout, [and] decor." And because the Doe Dancers invested nothing, save their physical exertion, makeup, and costumes, any reduction in their earnings—due to their dancing on, say, a holiday like Father's Day (when club attendance is, apparently, light)—is therefore the loss of wages due an employee, "not of [the] investment" of an independent contractor. *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1536 (7th Cir. 1987).

On the fourth factor of the economic realities test, "whether the service rendered requires a special skill," we tread carefully, having no wish to disparage the Doe Dancers or minimize the physical abilities that their

SUPREME COURT
OF
NEVADA

(O) 1947A

work requires. However, their particular talents and endurance on their heel-clad feet "do not change the nature of their employment relationship with [Cheetahs]." *Id.* at 1537. The question, as noted in *Terry*, is one of the presence and requirement of the sort of specialized skill common to independent contractors; that is, "whether their work requires the initiative demonstrated by one in business for himself or herself." 130 Nev. at 891, 336 P.3d at 959. And witnesses' testimony regarding the near absence of *any* requirements for performing at Cheetahs—aside from, perhaps, a compliant "attitude"—would seem to entirely negate this.

With regard to the fifth factor, there appears little permanency in the relationship between the Doe Dancers and Cheetahs—the manager's log book reflects the relatively frequent cessation of dancers' relationships with the club, sometimes without explanation—and the testimony of Ponterelli and various Doe Dancers suggests that the "length and the regularity" of the Doe Dancers' work was, at least to some degree, of their own choosing. *See Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 147 (2d Cir. 2017) (looking to the length and regularity of certain workers' relationship with a business in ruling on this factor). But even work of relatively short durational periods can qualify as employment rather than independent contracting. *See Lauritzen*, 835 F.2d at 1537-38 (holding that seasonal pickle-harvest pickers were employees not independent contractors). And, while schedule variability may, in some cases, serve as an indicator of employment status, it is not dispositive. *See Keller v. Miri Microsystems LLC*, 781 F.3d 799, 808 (6th Cir. 2015) (noting that "workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative" (internal quotations omitted)).

SUPREME COURT
OF
NEVADA

(O) 1947A

16

Instead, "the ultimate inquiry is the nature of the performers' dependence on the club." *Terry*, 130 Nev. at 891, 336 P.3d at 960. Accordingly, flexibility in scheduling is only of persuasive import where it affords the worker in question with entrepreneurial opportunities—"when an individual is able to draw income through work for others, he is less economically dependent on his putative employer." *Saleem*, 854 F.3d at 141. And here, particularly given Cheetahs' witnesses' testimony generally dismissing the qualifications of the Doe Dancers, we are simply not persuaded that their theoretical scheduling flexibility is in any real sense "the same as [the] true economic independence" that might exist in the case of an independent contractor. *McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452-53 (5th Cir. 1988).

The sixth and final factor—whether the Doe Dancers' work is "integral" to Cheetahs' business—requires little analysis. As Ponterelli acknowledged, a business such as Cheetahs "can't be a men's club without exotic dancers." Common sense leads us to agree, and Cheetahs' briefing appears to concede the point. Accordingly, the weight of the economic realities test factors support that the Doe Dancers are employees, as opposed to independent contractors, thereunder.

### III.

This leaves only the question of whether NRS 608.0155's definition of independent contractor operates to exclude the Doe Dancers from these constitutional base-line protections by narrowing the scope of which workers the MWA would otherwise cover. Enacted in 2015, following *Terry*, NRS 608.0155 states in relevant part,

> [F]or the purposes of this chapter, a person is conclusively presumed to be an independent contractor if:

SUPREME COURT
OF
NEVADA


(O) 1947A

17

(a) Unless the person is a foreign national who is legally present in the United States, the person possesses or has applied for an employer identification number or social security number or has filed an income tax return for a business or earnings from self-employment with the Internal Revenue Service in the previous year;

(b) The person is required by the contract with the principal to hold any necessary state business license or local business license and to maintain any necessary occupational license, insurance or bonding in order to operate in this State; and

(c) The person satisfies three or more of [certain additional criteria]."

NRS 608.0155.[3]

---

[3]The list of potential criteria includes

(1) Notwithstanding the exercise of any control necessary to comply with any statutory, regulatory or contractual obligations, the person has control and discretion over the means and manner of the performance of any work and the result of the work, rather than the means or manner by which the work is performed, is the primary element bargained for by the principal in the contract.

(2) Except for an agreement with the principal relating to the completion schedule, range of work hours or, if the work contracted for is entertainment, the time such entertainment is to be presented, the person has control over the time the work is performed.

(3) The person is not required to work exclusively for one principal unless:

Cheetahs' argument that its interpretation of NRS 608.0155—that is, its reading the statutory expansion of the class of independent contractors as applicable to the MWA's definition of employee—does not create any conflict therewith is puzzling. Admittedly, NRS 608.0155 is framed in terms of who is an "independent contractor," but it operates to distinguish "independent contractors" from "employees," which concepts are mutually exclusive. *See, e.g.*, Landis, 51 A.L.R. Fed. at 702 (collecting cases). Indeed, to say that NRS 608.0155 does not alter the MWA's definition of employee would likewise be to say that NRS 608.0155 does not affect which workers are employees under the MWA; or, put differently, that NRS 608.0155 does not exclude from the MWA's coverage any worker

(I) A law, regulation or ordinance prohibits the person from providing services to more than one principal; or

(II) The person has entered into a written contract to provide services to only one principal for a limited period.

(4) The person is free to hire employees to assist with the work.

(5) The person contributes a substantial investment of capital in the business of the person, including, without limitation, the:

(I) Purchase or lease of ordinary tools, material and equipment regardless of source;

(II) Obtaining of a license or other permission from the principal to access any work space of the principal to perform the work for which the person was engaged; and

(III) Lease of any work space from the principal required to perform the work for which the person was engaged.

otherwise covered by the constitutional definition of employee. And this is plainly not Cheetahs' position, all semantics aside. Thus, the following analysis assumes without deciding, that the Doe Dancers fall under this conclusive statutory presumption, which—if it does apply to MWA claims—would negate their constitutional minimum wage entitlement.

Beginning with the text of the statute itself, *see Banks v. Sunrise Hosp.*, 120 Nev. 822, 846, 102 P.3d 52, 68 (2004), and the statutory framework in which it falls, *see Leven v. Frey*, 123 Nev. 399, 405, 168 P.3d 712, 716 (2007), there is merit in Doe Dancers' argument that NRS 608.0155 only purports to apply "for the purposes of [NRS Chapter 608]"; that is, by its terms, the section appears to limit its reach to the statutory chapter in which it sits. Cheetahs, however, points to alternative language from Section 7 of the bill that enacted NRS 608.0155 (S.B. 224), stating that the bill applies "to an action or proceeding to recover unpaid wages pursuant to *[the MWA] or NRS 608.250 to 608.290, inclusive*." 2015 Nev. Stat., ch. 325, § 7, at 1744 (emphasis added).[4] Adding an additional wrinkle, and perhaps supporting Cheetahs' position, the Legislature also implicitly referenced both NRS Chapter 608 and the MWA in NRS 608.255—stating that independent contractors are not entitled to the minimum wage "[f]or the purposes of this chapter and any other statutory or constitutional provision governing the minimum wage paid to an employee." However, these sections are possible to read harmoniously—as its language plainly states, the definition of independent contractor in NRS 608.0155 (or Section 1 of

---

[4]Though this language was adopted into our state's official laws but not codified in the NRS, it holds the same persuasive value. *See Halverson v. Sec'y of State*, 124 Nev. 484, 486-87, 186 P.3d 893, 895-96 (2008) (holding that "while not enacted [into the NRS], the [language in question] is law, as it was enacted in the official Statutes of Nevada").

S.B. 224) applies only to NRS Chapter 608 claims, while Section 5 of S.B. 224 and NRS 608.255 merely serve to reaffirm that independent contractors are, generally, not eligible for minimum wages, whatever the source of authority supposedly justifying them. *See Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 179 P.3d 556, 560, 124 Nev. 193, 200-01 (2008) (noting that "a statute's provisions should be read as a whole . . . and, when possible, any conflict is harmonized"). Moreover, even if these sections were truly irreconcilable, the general/specific canon—instructing that when two statutes conflict, "the more specific statute will take precedence, and is construed as an exception to the more general statute," *Williams v. State, Dep't of Corr.*, 133 Nev. 594, 601, 402 P.3d 1260, 1265 (2017) (citation omitted)—would counsel the same outcome.

Indeed, the Legislature's reference to *both* NRS Chapter 608 and the MWA in NRS 608.255 and the introductory language of Section 5 of S.B. 224 supports this proffered reading. To wit, the Legislature plainly knew how to word laws to expressly reach claims brought under either NRS Chapter 608 or the MWA, and despite this, NRS 608.0155 states that it applies only "for the purposes of this chapter."[5] We are therefore particularly loath to read-in the sort of express language contained in NRS 608.255 and Section 5 of S.B. 224 to NRS 608.0155—"It is not [a court's] function or within [a court's] power to enlarge or improve or change the law." Elihu Root, *The Importance of an Independent Judiciary*, 72 Independent 704, 704 (1912). A court has only the "right and the duty . . . to interpret the [legislative] document" not "to rewrite the words." Edward H.

---

[5]Further confirming this is the introductory language to Section 7 of S.B. 224, which likewise included specific references to both the MWA and NRS Chapter 608. 2015 Nev. Stat., ch. 325, § 5, at 1744.

 

Levi, *The Nature of Judicial Reasoning*, 32 U. Chi. L. Rev. 395, 404 (1965); *cf. Zenor v. State, Dep't of Transp.*, 134 Nev. 109, 111, 412 P.3d 28, 30 (2018) (reasoning that the Legislature's omission of language was intentional).

Further supporting this reading is the principle that "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Degraw v. Eighth Judicial Dist. Court*, 134 Nev. 330, 333, 419 P.3d 136, 139 (2018) (internal quotations omitted). Integrally tied into the application of this canon here is that "constitutional supremacy prevents the Nevada Legislature from creating exceptions to the rights and privileges protected by Nevada's Constitution." *Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. 484, 489, 327 P.3d 518, 522 (2014). Indeed, in interpreting the MWA in *Thomas v. Nevada Yellow Cab Corp.*, we have previously reasoned that "[i]f the Legislature could change the Constitution by ordinary enactment, no longer would the Constitution be superior paramount law, unchangeable by ordinary means. It would be on a level with ordinary legislative acts, and, like other acts . . . alterable when the legislature shall please to alter it." *Id.* at 489, 327 P.3d at 522 (alteration in original) (internal quotations omitted).

*Thomas*'s reasoning is directly on point here—as we have indicated, the MWA provides broader minimum wage coverage than that offered by NRS Chapter 608. *See Thomas*, 130 Nev. at 488, 327 P.3d at 521 (noting that the MWA "expressly and broadly defines employee"); *Terry*, 130 Nev. at 884, 336 P.3d at 955 (noting that the MWA reflects "voters' wish that more, not fewer, persons would receive minimum wage protections"). And rather than, say, lobbying for legislative action, Nevada voters took it upon themselves to propose and adopt an amendment to the "superior

paramount law" of this state, via "[extra]ordinary means." *See Thomas*, 130 Nev. at 489, 327 P.3d at 522 (internal quotations omitted); *see also* John Dinan, *State Constitutional Amendment Processes and the Safeguards of American Federalism*, 115 Penn St. L. Rev. 1007, 1019 (2011) (noting that "where legislatures were not supportive [of increasing the minimum wage beyond the federal level], citizen-initiated statutes could be relied on to secure these policies, as occurred in several states," including Nevada). Given the MWA's supremacy, and the extraordinary measures the people of this state undertook to enact it, it only follows that NRS 608.0155 should be construed to accord with the MWA, not vice versa. *Thomas*, 130 Nev. at 489, 327 P.3d at 521-22. Indeed, "[a]ccepting [Cheetahs'] position 'would require the untenable ruling . . . that the constitution is presumed to be legal and will be upheld unless in conflict with the provisions of a statute.'" *Thomas*, 130 Nev. at 489, 327 P.3d at 521-22 (quoting *Strickland v. Waymire*, 126 Nev. 230, 241, 235 P.3d 605, 613 (2010)). Such a holding would run afoul of fundamental democratic principles and the people's apparent attempt to "insulate minimum-wage increases from the possibility of future legislative reversal." Dinan, *supra*, at 1019.

Additionally, accepting Cheetahs' reading of NRS 608.0155 would raise potential separation of powers questions—it is "[a] well-established tenet of our legal system . . . that the judiciary is endowed with the duty of constitutional interpretation[,]" not the Legislature. *Nevadans for Nev. v. Beers*, 122 Nev. 930, 943 n.20, 142 P.3d 339, 347 n.20 (2006). Simply put, it is not clear that the Legislature has the constitutional power to impose any particular interpretation of the term employee in the MWA upon this court by legislation—which, as discussed above, Cheetahs' reading of NRS 608.0155 would necessarily do.

SUPREME COURT
OF
NEVADA

(O) 1947A

Separate and apart from these principles, Cheetahs' understanding of the MWA "as allowing the Legislature to provide for additional exceptions to Nevada's constitutional minimum wage disregards the canon of construction *expressio unius est exclusio alterius*,' the expression of one thing is the exclusion of another." *Thomas*, 130 Nev. at 488, 327 P.3d at 521 (quoting *Galloway v. Truesdell*, 83 Nev. 13, 26, 422 P.2d 237, 246 (1967)). As *Thomas* held, the MWA "expressly and broadly defines employee, exempting only certain groups" not at issue (those under 18, employed by a "nonprofit organization for after school or summer employment or as a trainee" for 90 days or less). 130 Nev. at 488, 327 P.3d at 521. Accordingly, "the text necessarily implies that all employees *not* exempted by the Amendment . . . must be paid the minimum wage set out in the Amendment." *Id.* (emphasis added). Put differently. "the MWA's broad definition of employee and very specific exemptions necessarily and directly conflict with the [purported] legislative exception" Cheetahs proposes here. *Id.*

All this said, in *Thomas* we relied in part on the doctrine of implied repeal—that later-in-time legislation "is controlling over [a] statute that addresses the same issue." 130 Nev. at 489, 327 P.3d at 521 (internal quotations omitted). In theory, this principle could weigh against the Doe Dancers because NRS 608.0155 post-dates the MWA's enactment. But even crediting the doctrine in this context, the Legislature lacked the constitutional power to partially repeal the MWA's broad definition for the weighty reasons discussed above—the Legislature cannot by later-enacted statute abridge a right that the constitution guarantees. *See id.* at 489, 327 P.3d at 522.



Accordingly, NRS 608.0155 does not, and indeed could not, remove from MWA protections employer-employee relationships the constitutional provision protects. And because, as established above, the Doe Dancers are otherwise employees within the MWA's meaning, the district court erred by granting summary judgment in favor of Cheetahs and against the Doe Dancers on that point. We therefore reverse the district court's summary judgment and remand this matter to the district court for proceedings consistent with this opinion.

_____, J.
Pickering

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Cadish

_____, J.
Silver

_____, J.
Herndon

STIGLICH, J., concurring:

I agree that the MWA incorporates the economic realities test, which "examines the totality of the circumstances and determines whether, as a matter of economic reality, workers depend upon the business to which they render service for the opportunity to work." *See Terry v. Sapphire Gentlemen's Club*, 130 Nev. 879, 886, 336 P.3d 951, 956 (2014) (emphasis omitted). Nevada's voters enacted the MWA so that "more, not fewer, persons would receive minimum wage protections" and used broad language to that effect which mirrors the language in the Fair Labor Standards Act. *See id.* at 884, 336 P.3d at 955. I also agree that the plaintiffs in this case satisfy the economic realities test and are therefore entitled to the protections of the MWA.[1]

I write separately because I do not agree that "by its terms, [NRS 608.0155] appears to limit its reach to the statutory chapter in which it sits." Majority opinion *ante* at 20. Although NRS 608.0155 applies only "for the purposes of this chapter," that means it applies for the purposes of NRS 608.255(2), which states that independent contractors are not subject to the provisions of the MWA. These two sections were enacted as part of a single, narrowly focused legislative scheme. 2015 Nev. Stat. ch. 325, at

---

[1]Although I agree with the majority that the plaintiffs are employees for MWA purposes, I do not necessarily find all of the same facts persuasive. For example, I do not think the requirements that dancers be "respectable," "cover cuts with Band-Aids," or "keep their belongings in lockers" are particularly strong indicia of the type of control that evidences an employment relationship. Majority opinion *ante* at 14. In my view, Cheetahs' control over prices, the dancers' lack of meaningful entrepreneurial opportunity, and the fact that dancing is obviously "integral" to Cheetahs' business are better indicia of the relevant "economic realities."

1742-44. I agree that the principle of constitutional avoidance is an important aid when a legislative enactment is "susceptible of multiple interpretations," *Degraw v. Eighth Judicial Dist. Court*, 134 Nev. 330, 333, 419 P.3d 136, 139 (2018), but I do not find these provisions reasonably susceptible of multiple interpretations. In my view, the Legislature unambiguously decided that workers who satisfy the criteria of NRS 608.0155 should not be entitled to the protections of the MWA. I am concerned that in its effort to avoid creating constitutional problems, the majority distorts the plain meaning of the Legislature's words.

Nevertheless, I agree with the majority that "the Legislature cannot by later-enacted statute abridge a right that the constitution guarantees." Majority opinion *ante* at 24; *Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. 484, 489, 327 P.3d 518, 522 (2014) (explaining that "the Constitution [is] superior paramount law, unchangeable by ordinary means") (internal quotation marks omitted). Therefore, although I conclude the Legislature intended to limit the scope of the MWA, I would hold that it lacked the power to do so. Because I would reach the same result, albeit by a slightly different path, I concur.

_____Stiglich_____, J.
Stiglich